CLARK, Justice.
hThe defendant in this criminal matter is charged with DWI-3rd offense. The trial judge granted his motion to suppress evidence obtained in connection with a traffic stop by a police officer who was outside his jurisdiction. The court of appeal affirmed the trial court’s ruling, based on factors used to determine the constitutional reasonableness of an officer acting outside of his jurisdiction.
Although we find the factors set forth in the appellate court’s test should be considered in connection with the totality of the circumstances surrounding a traffic stop to determine reasonableness under the Fourth Amendment, we hold there is no constitutional or statutory basis for the specific requirements relied upon by the trial court and court of appeal. After our review, we hold the traffic stop was consti *290 tutionally reasonable, vacate the trial court’s judgment and remand to the trial court for further proceedings.
FACTS
The following evidence was adduced at the hearing on the defendant’s motion to suppress. At approximately 9 p.m. on November 11, 2011, Officer Brian Bell of the Haughton Police Department was sitting in his personal patrol car on a service road on the northeast side of the intersection of Highways 157 and 3227, adjacent to 1-20. He was on duty and within city limits. From this vantage point, Officer Bell could observe traffic exiting the interstate and the traffic light at 12the off-ramp for 1-20 and Hwy. 157, as well as the traffic light at the intersection of Highways 157 and 3227.
While Officer Bell sat observing traffic, a small white SUV drove up immediately next to him. The SUV’s occupants, a man and a woman costumed in white face paint, told Officer Bell they were almost run off the road while traveling on 1-20. They told Officer Bell the offending vehicle was a blue-colored pick-up truck, possibly a Chevy, which just went eastbound on Hwy. 3227.[1] Officer Bell could have obtained the names and addresses of the couple, or taken down the SUV’s license plate, but he did not. Despite the couple’s costumed appearance, nothing led Officer Bell to believe the couple was impaired, and he decided to immediately respond to the information they related to him.
Hwy. 3227 is situated between Highways 157 and 164, and runs in and out of the city limits of Haughton. From the intersection of Highways 157 and 3227, the city limits extend for approximately half a mile toward the east along Hwy. 3227. ■ The next quarter of a mile is outside city limits. About a mile further along is inside city limits. Hwy. 3227 then runs into Hwy. 164, which is situated in a north/south direction. The intersection of Hwy. 3227 and Hwy. 164 is outside Haughton city limits.
Officer Bell traveled east on Hwy. 3227, searching for a vehicle matching the description given to him by the couple in the SUV. At the intersection of Highways 3227 and 164, which is just outside Haughton city limits, he saw a dark-colored pick-up truck traveling south on Hwy. 164 about 200-300 feet away. Officer Bell could see the truck was straddling the double yellow center line of the highway, and could see the headlights of an approaching car from underneath the truck. Believing the truck needed to be stopped for the safety of the public, and possibly for the safety of the driver who might need medical attention, Officer Bell ^followed the truck down Hwy. 164 and speeded to catch up.
Officer Bell approached the truck within 2-3 minutes, just as the highway started to curve. Officer Bell saw oncoming traffic pass the truck, after which the truck, while negotiating the curve, swung into the left hand lane for oncoming traffic. At that point, Officer Bell radioed the Bossier Parish Sheriffs Office to notify them of his location and his intention to make a traffic stop of the truck.
Officer Bell watched the truck swing back into the proper lane of travel and then further to the right, turning onto a side road known as Boomtown Road. Officer Bell saw the truck swing into the oncoming travel lane of Boomtown Road, then back into the proper lane, then arcing onto the right shoulder of the road, coming to rest immediately in front of the stop sign at the intersection of Boomtown Road and Hwy. 614.
*291 As Officer Bell activated his police lights, the defendant emerged from the truck and walked to the back of his truck toward Officer Bell’s vehicle. Officer Bell’s vehicle was a blue 2007 Crown Victoria with the words “Police Officer” on the doors from the middle of the front door to the middle of the back door. The automobile was equipped with three settings of police emergency lights. The first setting lit up the rear deck of the vehicle. The second setting activated solid blue strobe lights on the front of the side mirrors. The third setting turned on a flashing light in the center on the inside of the car plus two clear strobe lights in the headlights. There are no lights on the top of the vehicle.
Officer Bell claims he did not activate any of the police lights to indicate to the truck’s driver to pull over while his vehicle was moving. Instead, he claimed he activated all three settings of the police emergency lights right before he got out of his car, after both cars were stopped. Once the police lights are activated, the police vehicle’s video camera, which is on continuously, backs up for a certain amount of time and then continues recording until turned off.
14Officer Bell approached the truck’s driver, the defendant John Emmitt Gates, and asked whether he required medical attention. When Mr. Gates denied requiring such attention, the officer asked Mr. Gates for his driver’s license and told him to sit on the front of the police vehicle. Officer Bell told Mr. Gates they needed to wait for a sheriffs deputy to arrive. Officer Bell refrained from asking Mr. Gates any questions or engaging in interrogation as to what Mr. Gates had done earlier that night or whether he was driving while impaired.
Mr. Gates claims he was traveling southbound on Hwy. 164 when he saw blue strobe lights on the sides of a car behind him. He turned off onto Boomtown Road because he thought the lights indicated he was being followed by the police. He assumed the police wanted him to stop.
Within 5-10 minutes, Deputy Orr of the Bossier Parish Sheriffs Department arrived. Officer Bell gave Mr. Gates’ driver’s license to Deputy Orr. Deputy Orr’s report states Office Bell told the deputy he stopped the defendant for improper lane use on Hwy. 164. After administering a field sobriety test to Mr. Gates, Deputy Orr arrested Mr. Gates for DWL
A DVD of the video recording was entered into evidence as a joint exhibit at the suppression hearing. Officer Bell testified the video recording was an accurate representation of the events. The video recording shows the police vehicle approaching a truck traveling on a two-lane highway. After an on-coming car passes the truck, the truck swerves into the on-coming lane as it negotiates a slight curve. The truck resumes travel in the proper lane, then swings over to the right to exit the highway onto a small side road, presumably Boomtown Road. The truck is initially in the left or on-coming travel lane of the side road, but then corrects back into the proper lane before making a wide arc to the right, ending up with the driver’s side of the truck directly in front of a stop sign and the passenger side of the truck slightly off the road. Lights from the police vehicle are activated just as |sthe driver of the truck gets out. The truck’s driver is talking and gesturing as Officer Bell comes into view. Officer Bell speaks to the truck’s driver and directs him to the front of the police vehicle. The video recording shows the truck’s driver hand over his driver’s license. The two men appear to be talking, but it is not possible to determine what is said. Approximately 7 minutes later, Deputy Orr arrives and begins *292 his investigation. Mr. Gates was ultimately arrested for DWI.
PROCEDURAL HISTORY
Since Mr. Gates has two previous convictions for DWI, he was charged by bill of information with DWI-3rd offense in the instant matter, a violation of La. R.S. 14:98(D). The defense filed a motion to suppress challenging the initial detention of Mr. Gates on two grounds. The defense argued: (1) the information which led to Officer Bell’s investigation was an anonymous tip which was insufficient to warrant the initial detention of Mr. Gates; and (2) Officer Bell, who was outside his jurisdiction, did not obtain permission from a law enforcement agency with jurisdiction before making the initial detention, a violation of the requirements of State v. Williams, 45,775 (La.App. 2 Cir. 8/27/10); 46 So.3d 262. The defense contended the initial detention was constitutionally unreasonable; thus, any evidence seized after Mr. Gates’ initial detention should be suppressed.[2]
At this point, it is necessary to discuss the facts and holding in Williams, as well as a companion case handed down the same day by the Second Circuit Court of Appeal. The Williams case also involved a motion to suppress evidence obtained from a traffic stop that resulted in a prosecution for a third offense DWI. The parties stipulated to certain facts at the suppression hearing. The stipulated facts showed the officer who initiated the traffic stop was outside his jurisdiction. The officer had probable cause to initiate the stop due to the impaired driving of | nthe defendant, however, the officer did not have probable cause to believe that a felony crime had been committed either outside his presence or in his presence. The parties stipulated the officer was not in hot pursuit and that after the officer initiated the stop, a law enforcement officer with jurisdiction began the DWI investigation which led to the subsequent arrest of Williams. The trial court granted Williams’ motion to suppress because the officer who initially detained him was outside his jurisdiction.
Considering the imminent danger of harm posed by dangerous driving with the fact that “reasonableness” is the “ultimate touchstone” of the Fourth Amendment, the appellate court in Williams held it would be unreasonable to prohibit a commissioned, trained police officer, although out of his or her jurisdiction, from stopping a vehicle he or she observes which is driving so erratically that it puts the public in imminent danger of harm. Id., 45,775, p. 3; 46 So.3d at 264 (emphasis added). The appellate court then found, in order to ensure the stop by a commissioned law enforcement officer outside his or her jurisdiction was reasonable under the Fourth Amendment, the following limiting factors must be in place:
1. The officer personally observes a driver operating a vehicle in an erratic manner, so as to cause the officer to reasonably believe the driver is impaired and is a danger to the public, and
2. The officer is in a marked vehicle, and
3. The officer gets in contact with an officer having jurisdiction and gets permission to effectuate the stop, and
4. The investigation is conducted by an officer who has jurisdiction.
Williams, 45,775, p. 3; 46 So.3d at 264. The appellate court reversed the granting of the motion to suppress but remanded the matter to the trial court for its determination whether the arresting officer’s *293 actions met the requirements established in the opinion.
State v. Stapa, 45,773 (La.8/27/10); 46 So.3d 264, writ denied, 2010-2126 (La. 11/19/10); 49 So.3d 391, was considered as a companion case to Williams and was handed down at the same time. In Stapa, the appellate court reversed the trial court’s suppression of evidence obtained as a result of a stop by a police officer outside of her jurisdiction. In that case, the officer witnessed the defendant swerve three times while she drove home in her marked unit. The officer called law enforcement with jurisdiction to advise them of the dangerous situation. The officer with jurisdiction told her to initiate a traffic stop of the swerving vehicle but to remain in her police vehicle. The officer with jurisdiction arrived shortly thereafter and conducted an investigation leading to an arrest for DWL Although the Stapa opinion did not mention the specific limiting factors established in Williams, each of the factors was met by the facts of the case.
With these cases establishing the prevailing appellate court standard, the trial court took the defendant’s motion to suppress under advisement following the taking of evidence and the arguments of counsel. The trial judge subsequently issued a written ruling, explaining his reasoning and holding. First, the court concluded that the persons in the white SUV who gave the information to Officer Bell could only be characterized as anonymous tipsters, since there exists no way to independently test the reliability of the information they provided.
Next, the trial judge noted the vehicle in question would have traveled directly in front of Officer Bell as he sat at the intersections of Highways 157 and 3227, yet Officer Bell did not independently observe any erratic driving at that time which focused his attention to the defendant’s vehicle. The trial court found any discussion of the concept of “hot pursuit” to be without merit, since Officer Bell began his pursuit of the pick-up truck based on information provided by an anonymous tipster, he had no independent observation of erratic driving or violation of traffic regulations occurring inside the city limits of Haughton, and any 18observation of alleged traffic violations would have been outside the town limits of Haughton.
After reviewing the DVD of the video camera of Officer Bell’s vehicle, the trial judge apparently resolved the discrepancy between Officer Bell and Mr. Gates by crediting the defendant’s testimony that Mr. Gates pulled to the shoulder of the road in compliance with the police vehicle’s lights being activated. The trial judge found “[t]he review of the video serves to indicate that Mr. Gates pulls to the shoulder of the road and not directly to the stop sign. A reasonable person can conclude that this maneuver was executed in compliance with the police units}’] lights being activated.”
Finally, the trial judge reviewed both Williams and Stapa, finding both cases somewhat dissimilar to the factual situation presented here. Nevertheless, the trial judge utilized the factors set forth in Williams to determine whether or not the stop in this instance violated the rights of Mr. Gates. With the Williams test in mind, the trial judge found Mr. Gates was detained “at the point in time that the lights of the police officer’s unit where {sic} activated” and that Officer Bell failed to obtain permission to effectuate a traffic stop from an officer having jurisdiction. So finding, the trial judge granted the defendant’s motion to suppress all of the information discovered subsequent to the detention.
*294 The court of appeal granted the state’s writ application and ordered the parties to file briefs. After a full review, the court of appeal affirmed the trial court’s ruling, finding no abuse of the trial judge’s discretion. See State v. Gates, 47,894 (La.App. 2 Cir. 5/15/13); 114 So.3d 538. The court of appeal found three of the four Williams factors were satisfied, but that Officer Bell failed to ask for permission to make the traffic stop by law enforcement having jurisdiction in that area. Id., 47,894, p. 7; 114 So.3d at 542. While the court of appeal did not fault Officer Bell for his actions (“While we certainly do not fault Officer Bell for acting 19in the interest of public safety, ...” Id.), the appellate court felt it was constrained to find on this record, and in light of the test set forth in Williams to affirm the trial court ruling that granted the defendant’s motion to suppress. Id., 47,894, p. 8; 114 So.3d at 542-543.
We granted the state’s writ to review the correctness of the lower courts’ rulings. State v. Gates, 2013-1422 (La.11/1/13); 124 So.3d 1102.
APPLICABLE LEGAL PRINCIPLES

Standard of Review

This matter is before us for a determination whether the lower courts erred in granting the defendant’s motion to suppress and in affirming that ruling. The defendant’s motion to suppress challenges hié initial detention, or seizure, by Officer Bell. When the legality of a search or seizure is placed at issue by a motion to suppress, the state must bear the burden of proving the admissibility of the evidence seized by the police acting without a warrant. State v. Thompson, 2011-0915, p. 13 (La.5/8/12); 93 So.3d 553, 563; State v. Martin, 2011-0082, p. 6 (La.10/25/11); 79 So.3d 951, 955; La.C.Cr.P. art. 703(D). A trial court’s decision relative to the suppression of evidence is afforded great weight and will not be set aside unless there has been an abuse of that discretion. Thompson, 2011-0915, p. 13; 93 So.3d at 563; Martin, 2011-0082, p. 6; 79 So.3d at 955; State v. Wells, 2008-2262, p. 5 (La.7/6/10); 45 So.3d 577, 581.

Detention or Seizure

The Fourth Amendment to the United States Constitution and La. Const, art. 1, § 5 guarantee citizens the right to be free from unreasonable searches and seizures. The Fourth Amendment provides that the people shall “be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.... ” La. Const, art. 1, § 5 provides in pertinent part: “Every person shall be secure in his person, property, communications, houses, papers, and effects against | ^unreasonable, searches, seizures, or invasions of privacy.”
Officer Bell initiated a traffic stop of the defendant; Deputy Orr arrested the defendant. “Probable cause to arrest exists when the facts and circumstances within an officer’s knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a person of average caution in the belief that the accused has committed an offense.” Wells, 2008-2262, p. 8; 45 So.3d at 582-583. While an arrest requires probable cause, an investigatory stop requires only the lesser standard of reasonable suspicion which is codified in Louisiana under La. C.Cr.P. art. 215.1. La.C.CrJP. art. 215.1 authorizes the temporary questioning of persons in public places and provides in pertinent part: “(A). A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his *295 actions.” “In making a brief investigatory stop the police still must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.” State v. Duhe, 2012-2677, p. 8 (La.12/10/13); 130 So.3d 880, 885 (internal citations omitted).
In State v. Hunt, 2009-1589 (La. 12/1/09); 25 So.3d 746, we discussed the legal principles applicable to a motion to suppress where the contested search and seizure arose in connection with a traffic stop, as follows:
It is undisputed tha[t] an individual’s constitutional protections from unreasonable search and seizures are triggered during an investigative traffic stop. United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). The law provides the stopping of a vehicle and its occupants constitute a seizure under the law. Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). In determining the legality of a traffic stop, a reviewing court must decide “whether the officer’s actions were justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.” Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).
For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity occurred or is about to occur, before stopping the vehicle. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); State v. Kalie, 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881. When an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable, regardless of the officer’s subjective motivation. Whren v. United States, 517 U.S. 806, 810, 813, 116 S.Ct. 1769, 1772, 1774, 135 L.Ed.2d 89 (1996); State v. Waters, 00-0356, p. 4 (La.3/12/01), 780 So.2d 1053, 1056; State v. Landry, 98-0188, p. 2 (La.01/20/99), 729 So.2d 1019, 1020.
Id., 2009-1589, p. 8-9; 25 So.3d at 753.
Reviewing courts must look to the totality of the circumstances in each case to determine whether police officers have an objectively reasonable basis for their actions. State v. Cure, 2011-2238, p. 4 (La.7/2/12); 93 So.3d 1268, 1270; State v. Pratt, 2008-1819, p. 1 (La.9/4/09); 16 So.3d 1163, 1164 (“As a general matter, ‘[t]he determination of reasonable suspicion for an investigatory stop, or probable cause for an arrest, does not rest on the officer’s subjective beliefs or attitudes but turns on a completely objective evaluation of all of [the] circumstances known to the officer at the time of his challenged action.”), citing Kalie, 96-2650, p. 1; 699 So.2d at 880; State v. Sylvester, 2001-0607, p. 5 (La.9/20/02); 826 So.2d 1106, 1109 (“In determining whether police officers have a particularized and objective basis for conducting an investigatory stop, reviewing courts must look at the totality of the circumstances of each case, a process which allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.”) (internal citations omitted).

Anonymous Tipsters and Concerned Citizens

The defense claims the information conveyed to Officer Bell by the couple in the white SUV had no indicia of reliability and should be considered an anonymous tip.
112The Supreme Court recently handed down a decision concerning anonymous tipsters with facts similar to those presented *296 here. In Navarette v. California, 572 U.S. —, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), a 911 caller reported that a truck had run her off the road. The caller’s information about the truck, including its make and license plate number, and its location was broadcast through police dispatch. A police officer located the vehicle the 911 caller identified and executed a traffic stop. A second officer, who had separately responded to the broadcast of the 911 call, also arrived on the scene. The two officers smelled marijuana as they approached the truck; a search of the truck bed revealed 30 pounds of marijuana. The officers arrested the driver and his passenger. When their motion to suppress the evidence was denied, they pleaded guilty to drug charges. The California Court of Appeal affirmed and the California Supreme Court denied review. Id., 134 S.Ct. at p. 1686-87.
The Supreme Court was presented with the issue whether the officers lacked reasonable suspicion of criminal activity to justify their stop of the truck based solely on the information supplied by the 911 caller. The Court began its analysis by reiterating its earlier holding that an anonymous tip, under appropriate circumstances, could demonstrate sufficient indi-cia of responsibility to provide reasonable suspicion to make an investigatory stop. Id., 134 S.Ct. at p. 1688.
In reviewing the 911 call at issue, the Court concluded there were several factors upon which to base its ultimate determination that the call bore adequate indicia of reliability for the officer to credit the caller’s information, even assuming the call was anonymous. First, the caller claimed eyewitness knowledge of the alleged dangerous driving, which the Court found lent significant support to the tip’s reliability. Second, the Court found the timeliness of the nearly contemporaneous report of an event negated the likelihood of deliberate or conscious misrepresentation and supported the trustworthiness of the information. In this regard, the Court likened this aspect to an excited utterance of a present | iasense impression. Another factor which supported the conclusion that the caller’s information was truthful was the caller’s use of the 911 emergency system. Since 911 calls can be recorded, and because misuse of the emergency system subjects a caller to prosecution, the Court found this circumstance was relevant for a reviewing court’s consideration. Although the Court found this to be a close case, it concluded the relevant circumstances, taken together, justified the officer’s reliance on the information reported in the 911 call. Id., 134 S.Ct. at p. 1688-91,1691-92.
The Court additionally found the 911 caller’s report of being run off the roadway, viewed from the standpoint of an objectively reasonable police officer, created reasonable suspicion of an ongoing crime such as drunk driving. Taking a “commonsense approach,” the Court recognized certain driving behaviors as sound indicia of drunk driving. These behaviors included weaving all over the roadway, crossing over the center line, driving in the median, and running other drivers off of the road. The Court could not say the officer acted unreasonably under the circumstances in stopping a driver whose alleged conduct was a significant indicator of drunk driving. Id., 134 S.Ct. at p. 1690-91.
The denial of Navarette’s motion to suppress was affirmed, with the Court finding an indicia of sufficient reliability in the 911 call under the totality of the circumstances to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road. That, in turn, made it reasonable under *297 the circumstances for the officer to execute a traffic stop. Id., 134 S.Ct. at p. 1692.
We have noted:
An anonymous tip may provide probable cause for an arrest, Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), or reasonable suspicion for an investigatory stop, Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), if it accurately predicts future conduct in sufficient detail to support a reasonable belief that the informant had reliable information regarding the suspect’s illegal activity.
State v. Smith, 2000-1838, p. 1 (La.5/25/01); 785 So.2d 815, 816. This court has distinguished between anonymous tipsters, about whom there can be no indication about the reliability of the information provided, and citizen informants, whom we have described as “witnesses ... providing information about a crime as it was happening.” State v. Elliott, 2009-1727, p. 7 (La.3/16/10); 35 So.3d 247, 252.[3]
In Elliott, the occupants of a vehicle who were almost hit by a car running a red light placed a 911 call. The 911 callers stayed on the line while they followed the vehicle which almost hit them, and relayed to the 911 dispatcher the continuing erratic driving which they were observing. Eventually, local police, acting on a dispatcher report, stopped the defendant’s vehicle. The 911 callers pulled over behind the officer, remained on the scene and identified the defendant as the person driving the car that almost hit them, and testified at the defendant’s trial. The trial court in Elliott granted the defendant’s motion to suppress, finding the “anonymous call” alone was insufficient to justify the stop where the officer making the stop had no knowledge of the credibility or reliability of the informant and had not observed any erratic driving or other traffic violations. The court of appeal affirmed. We reversed, finding “[t]he dispatcher could reasonably infer from the circumstances that the caller was motivated by the desire to eliminate an immediate risk to public safety and was holding herself accountable for the information she provided by identifying herself, if not by name, then by the cellular phone from which she was calling.” Elliott, 2009-1727, p. 7; 35 So.3d at 252. We concluded “[t]he information conveyed to the dispatcher provided reasonable suspicion to stop the defendant’s vehicle because it expressly described traffic violations as they occurred ... the witnesses pulled in behind the patrol vehicle and continued to make themselves available to the police and accountable hafor the information they had provided.” Id., 2009-1727, p. 8; 35 So.3d at 252.

Officers Acting Outside Their Jurisdiction

Since Officer Bell received the information which led to his investigation while within his territorial jurisdiction, but pursued the defendant outside of his jurisdiction and initiated the traffic stop outside of his jurisdiction, we will review jurisprudence concerning the validity of actions taken by officers outside their jurisdiction. In State v. Bickham, 404 So.2d 929, 932 (La.1981), we held:
First, the codal provisions which authorize lawful arrest both with and without a warrant empower officers in close pursuit to leave their territorial jurisdiction for the purpose of effecting an arrest. C.Cr.P. Arts. 204 and 213.[4] Although *298 C.Cr.P. Art. 215.1 [which authorizes a brief investigatory stop and frisk for weapons] does not contain explicit language relating to the officer’s right to make a “close pursuit” stop, common sense would certainly imply that such a procedure is appropriate within the “spirit” of the statute which authorizes a temporary detention. See C.Cr.P. Art. 3.[5] Further, although the Louisiana “stop and frisk” statute authorizes peace officers to effectuate stops under defined circumstances, the statute does not expressly limit the peace officer to his territorial jurisdiction. While it is arguably reasonable to construe the statute as authorizing an investigatory stop only in the territorial jurisdiction in which the officer is authorized to make an arrest, it is equally reasonable to construe the statute as authorizing the officer in close pursuit to leave the jurisdiction to make an investigatory stop, when, as here, the officer initiated his pursuit for the purpose of stopping while within his jurisdiction.
I,nAs discussed in Bickham, Art. 213 authorizes a peace officer to arrest a person when an offense has been committed in his presence, whether the offense is a felony or a misdemeanor. See Art. 213(1). If the arrest is for a misdemeanor, the arrest must be made immediately or on close pursuit. Id. A peace officer may arrest a person without a warrant when the person to be arrested has committed a felony outside the presence of the officer. See Art. 213(2). A peace officer may arrest a person without a warrant when the person to be arrested has committed a misdemeanor outside the officer’s presence if the officer has reasonable cause to believe the person to be arrested committed the offense. See Art. 213(3). When a peace officer is in close pursuit of a person to be arrested under any of these circumstances, the officer may enter another jurisdiction in this state to make the arrest.
Even a private citizen may make an arrest when a person commits a felony, whether in or out of the private citizen’s presence. See Act. 214.[6] Often, reviewing courts will find a felony arrest by a police officer who is outside his jurisdiction is valid by finding the officer acted only as a private citizen. See Bickham, 404 So.2d at 932 (armed robbery); State v. Jones, 263 *299 La. 164, 175, 267 So.2d 559, 563 (La.1972) (theft); State v. Ayo, 2008-0468, p. 11 (La. App. 5 Cir. 3/24/09); 7 So.3d 85, 94 (armed robbery and resisting arrest); State v. Jarvis, 97-1174, p. 5-6 (La.App. 5 Cir. 4/9/98); 710 So.2d 831, 834 (armed robbery); State v. Washington, 444 So.2d 320, 324 (La.App. 1 Cir.1983), writ denied, 445 So.2d 450 (La.1984) (armed robbery). This court has also held an officer in close pursuit of a person whom he had reasonable cause to believe had committed a misdemeanor offense had authority to arrest the subject, even though he was outside his territorial jurisdiction, because the officer pursued the suspect directly from the scene of the lacrime to the point of arrest. See State v. Terracina, 309 So.2d 271, 273 (La.1975).
Significant to this case, we have rejected the contention “that the remedy necessary for enforcement of the territorial jurisdiction rule is exclusion of reliable evidence produced as a result of arrests or stops initiated in good faith by an officer who began to act within his territorial limits.” Bickham, 404 So.2d at 933.[7] The Fourth Amendment does not prescribe a remedy for its violation. State v. Matthieu, 506 So.2d 1209,1212 (La.1987). Instead,
[t]he primary purpose of the exclusionary rule is to deter future unlawful police conduct. It is designed not to redress the injury to the privacy of the victim of the search, but to deter unconstitutional methods of law enforcement. ... The rule is thus not to be imposed in a vacuum or administered automatically or mechanically, but is to be applied with its deterrent effect in mind.... It does not purpose to reach all illegal conduct of officers, and does not apply to deter wrongful or improper official conduct that does not violate a person’s reasonable expectation of privacy under the Fourth Amendment. Matthieu, 506 So.2d at 1212.
In Matthieu, where the search was not deemed to be unconstitutional because it was only violative of a procedural rule regarding the territorial jurisdiction of the court issuing a warrant, Justice Dennis noted territorial boundaries “serve primarily to distribute the workload in criminal investigations throughout the state.” Id., 506 So.2d at 1214 (Dennis, J. concurring).
Not all violations of statutory restrictions on arrest are constitutional violations. Bickham, 404 So.2d at 933. Nor have we extended the exclusionary rule to include non-constitutional violations of statutes which are. not designed to protect the privacy interests of citizens. “When the statutory limitation (or duty) alleged to have been violated by the officer is not designed to implement fundamental rights of privacy, this court should not employ the exclusionary rule | isas a device to enforce such legislative directives. This is, of course, particularly true when the .facts strongly support a finding that the officer acted reasonably and in good faith in arguably exceeding the bounds of his authority.” Bickham, 404 So.2d at 933.
In State v. Durke, 2003-3174 (La.10/14/04); 885 So.2d 513, we reviewed a somewhat similar fact situation where an on-duty university officer pulled over a defendant one mile from the officer’s post *300 (and thus, outside the perimeter of the campus within which the officer had authority to arrest) after observing him weaving between the lanes and repeatedly crossing the fog line. Citing Matthieu, we held “even assuming that the officer acted outside of the territorial limits of his authority, his conduct did not flagrantly disregard those limits and did not provide constitutional grounds for suppressing evidence of the defendant’s intoxication.” Durke, 2003-3174, p. 1; 885 So.2d at 514. We found:
the officer otherwise lawfully observed the traffic violations which preceded the stop, and the circumstances under which the officer seized the defendant, whether legal or illegal, did not preclude prosecution of the traffic infractions based on those independent observations. United States v. Crews, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980) (“An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.”)
Durke, 2003-3174, p. 1-2; 885 So.2d at 514.
DISCUSSION
We begin our analysis with the information that started Officer Bell’s investigation. Although we do not know the identi- ■ ties of the costumed couple in the SUV, we cannot consider them entirely anonymous tipsters. In Navarette, the court found use of the 911 emergency system, which can record and verify important information about a caller, was another indicator of the reliability of the tip. In this case, the couple in the SUV presented themselves personally to Officer Bell, without knowing whether or not he would require them to identify | ^themselves, and relayed information about a crime they just witnessed.[8] Officer Bell could have ascertained their identities and noted the license plate of their vehicle, but he did not. Apparently seeing no reason to question their reliability, and perhaps recognizing the imminent harm which could befall the public and the driver of the suspect vehicle, he decided to immediately act on the information provided. Even assuming the information obtained from the couple in the SUV was an anonymous tip, we find Officer Bell possessed the minimum reasonable suspicion that a crime was occurring to justify a further investigation.
For our purposes, we do not have to determine whether Officer Bell’s failure to obtain the couple’s identifying information was reasonable or not, since he subsequently viewed several examples of the defendant’s impaired driving personally. Moreover, depending upon how dire the information, and the immediacy of the threat of harm, we can easily envision circumstances under which an officer stopping to obtain detailed contact information from members of the public who relate information about crimes in progress could be itself considered unreasonable.[9]
*301 This is an appropriate point to discuss the trial court’s apparent credibility determination. As a general rule, we review “trial court rulings under a deferential standard with regard to factual and other trial determinations, while legal findings are subject to a de novo standard of review.” Hunt, 2009-1589, p. 6; 25 So.3d at 751. “When a trial court makes findings of fact based on the weight of the Rotestimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings.” Id.
The transcript shows Mr. Gates claimed he swung onto Boomtown Road from Highway 164 and brought his car to the side of the road because he saw blue strobe-like lights on the side of the car following him, assumed he was being followed by police, and believed the police officer was pulling him over. Officer Bell claimed he did not activate any of the three settings of the police emergency lights with which his vehicle was equipped until both cars were stopped on the side of the road. The trial judge found in his written ruling that (1) a reasonable person could conclude Mr. Gates pulled over in compliance with the activation of the police unit’s lights; (2) a detention occurred at the point that the emergency lights were activated and (3) Officer Bell failed to ask permission from law enforcement with jurisdiction to initiate the detention.
We find the trial court’s credibility determination on this point ultimately proves to be irrelevant. Whether the police lights were activated when Officer Bell first saw the defendant on Highway 164 or when Officer Bell pulled over behind the defendant on Boomtown Road, both locations were outside Officer Bell’s jurisdiction. Nevertheless, Officer Bell had authority to initiate the detention of Mr. Gates under La.C.Cr.P. art. 213.
A review of our case law shows the interpretation of “close pursuit” by Louisiana courts encompasses both the situation where an officer with the reasonable belief that a crime has been committed, or is being committed, follows a suspect out of his jurisdiction, or where an officer with such a reasonable belief is searching for a suspect and travels out of his jurisdiction. The following are examples of cases where a police officer follows a person from the scene of a crime to a point outside his jurisdiction. In Bickham, a police officer received a | ^report of a robbery over the police radio. He saw a person matching the description of the suspect in a vehicle in the vicinity of the crime and followed him, activating the police emergency lights and siren. As the pursuit continued, the police officer saw two other persons in the vehicle, which coincided with the number of suspects sought. The police officer continued to pursue the suspect outside of his jurisdiction. A roadblock was set up and the suspects were ultimately apprehended. Id., 404 So.2d at 931. In Terracina, two children saw a group in a vehicle “mooning” them and told their father, who happened to be a city police lieutenant. The police officer, who was off-duty, gave chase in his police vehicle and followed the suspects for a considerable distance, and out of his jurisdiction, before radioing ahead to officers with jurisdiction to set up a roadblock. Id., 309 So.2d at 272. In State v. Owens, 565 So.2d 1062, 1064 (La.App. 5 Cir.1990), officers began their pursuit of the defendant in their territorial jurisdiction and pursued a fleeing vehicle beyond that jurisdiction before stopping the defendant.
*302 We have also found “close pursuit” applicable where police officers obtain information within their jurisdiction, and their investigation leads them outside their jurisdiction. In Jones, an armed robbery-incident was reported in a subdivision in the southwestern portion of Shreveport. A suspicious van was first observed leaving the southeastern portion of the city on an east-west road. City police followed the van outside the city until it stopped at a gas station. Their subsequent arrest of the van’s occupants was found valid under close pursuit. Id., 263 La. at 169, 267 So.2d at 561 n. 1. In Ayo, a deputy was told a suspect got into a cab, headed across parish lines. The deputy traveled to the adjacent parish looking for the cab and its occupant. The reviewing court found the concept of close pursuit validated the resulting arrest where arrest occurred within an hour of the crime a few blocks over the adjoining parish line. The pursuit of the defendant l22was initiated in the parish where the crime occurred, was immediate and continuous and the arrest was the result of an uninterrupted police investigation. Id., 2008-0468, p. 5-6; 7 So.3d at 90-91. In Merchant, an officer saw a plane flying at a low altitude late at night. Although the nearby airport was outside his jurisdiction, he traveled there to continue his investigation of what he considered to be suspicious circumstances. Id., 490 So.2d at 338. In Washington, the arrest of armed robbery suspects occurred a few miles outside the deputies’ territorial jurisdiction. The reviewing court found the deputies’ arrests were authorized by close pursuit, as the suspects were found only five and a half miles from the scene of the crime, and only two hours after the crime occurred and the deputies started to trail them. Id., 444 So.2d at 322.
Returning to the facts of the instant detention, we note that due to the configuration of the roads upon which Officer Bell traveled in trying to investigate the report of a pickup truck being driven erratically, he was passing in and out of his jurisdiction. When he first spotted the truck, Officer Bell was just outside his jurisdiction. Yet from that location, the information he had received concerning an erratic driver was confirmed by Officer Bell’s own observation of the truck traveling south on Highway 164 and straddling the center line of the highway. At that point, Officer Bell had two options — to either follow the truck further outside of his jurisdiction and initiate a traffic stop to investigate the illegal driving he just witnessed, or to radio the information to law enforcement with jurisdiction and hope no harm came to the public or the driver of the truck.[10]
| ^Police are allowed to conduct investigative stops based on reasonable suspicion, viewed under the totality of the circumstances. The Williams court, in adding limiting factors, apparently of its own *303 making, fashioned a test not mandated by constitutional or statutory authority. Although the factors which Williams required are relevant considerations to be evaluated in determining the reasonableness of an officer acting outside his jurisdiction, there can be no mandatory check list when considering a totality of the circumstances. Since these cases are so fact-specific, we find the trial judge’s determination that the state failed to satisfy one requirement of the Williams test was legal error. The court of appeal, which affirmed the trial judge’s ruling on the basis of the same test, also erred. After our review, we hold the officer’s actions in initiating a traffic stop of the defendant, viewed in the totality of the circumstances, did not constitute an unreasonable seizure under either the Fourth Amendment or under La. Const, art. I, § 5.
Here, the police officer had a reasonable belief that an offense had been committed and that the commission of the offense may have been continuing. This reasonable belief arose when concerned citizens personally presented themselves to Officer Bell to relate information about a person driving erratically. Deciding to act on this first-hand information, Officer Bell set out to follow the path of the suspect vehicle. In doing so, he traveled in and out of his jurisdiction.
Just after he left his jurisdiction, Officer Bell spotted what he thought was the suspect vehicle. Officer Bell spotted the suspect vehicle only 2-8 minutes after he received the information that it was traveling east on Highway 8227. Officer Bell had followed that route, and was stopped where Highway 3227 met Highway 164. From that location, Officer Bell personally observed the suspect vehicle | ^dangerously straddling the center line of the roadway. At that point, “[pjrotection of the public, as well as defendant, who may have had a serious medical problem, became paramount and justified a brief, limited intrusion.” State v. Boothe, 37,702, p. 2 (La. App. 2 Cir. 5/22/03); 844 So.2d 1139, 1141.[11] At this point, Officer Bell had probable cause to believe the driver of the suspect vehicle had violated the traffic laws, which would have made even an arrest of the defendant to be considered constitutionally reasonable. See Virginia v. Moore, 553 U.S. 164, 171, 128 S.Ct. 1598, 1604, 170 L.Ed.2d 559 (2008) (“In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable.”).
Following the suspect vehicle out of his jurisdiction, Officer Bell saw the driver cross into the on-coming traffic lane while negotiating a curve. Officer Bell informed the law enforcement agency with jurisdiction of his location and his intention to initiate a traffic stop. The law enforcement agency with jurisdiction immediately dispatched an officer to the scene. Whether in response to police emergency lights or not, the driver of the suspect vehicle *304 exited to the right off of Highway 164 onto Boomtown Road, swinging into the oncoming travel lane before correcting into the proper travel lane. The driver then turned the suspect vehicle in a wide arc, briefly entering again the on-coming lane of travel before | ^pulling to a stop immediately in front of a stop sign and slightly off the roadway.[12] Officer Bell ascertained the driver did not require medical assistance and obtained the driver’s identification. Within seven minutes, an officer with jurisdiction arrived and conducted an investigation which ultimately led to the driver’s arrest for DWI. We find these circumstances, considered in their totality, lead us to conclude Officer Bell’s actions were objectively reasonable.
The defense complains attention is drawn toward the alcohol-impaired driver only for reasons of political correctness, and argues there are other types of impaired driving or driving-related activities which are statistically more dangerous. We agree with these views expressed in Virginia v. Harris, 558 U.S. 978, 130 S.Ct. 10, 175 L.Ed.2d 322 (2009) (Roberts, C.J. and Scalia, J., dissenting from the denial of certiorari):
There is no question that drunk driving is a serious and potentially deadly crime, as our cases have repeatedly emphasized. See, e.g., Michigan Dept, of State Police v. Sitz, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (“No one can seriously dispute the magnitude of the drunken driving problem or the States’ interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation’s roads are legion”). The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases. In a case like [Florida v.] J.L., [529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ], the police can often observe the subject of a tip and step in before actual harm occurs; with drunk driving, such a wait- and-see approach may prove fatal. Drunk driving is always dangerous, as it is occurring. This Court has in fact recognized that the dangers posed by drunk drivers are unique, frequently upholding anti-drunk-driving policies that might be constitutionally problematic in other, less exigent circumstances.[13]
12fiEven if we assume Officer Bell acted outside of his territorial jurisdiction in the detention of the defendant, suppression of the evidence obtained after Mr. Gates’ detention would not be warranted. The statutory rules which delineate the territorial zones of responsibility of various law enforcement agencies are not designed to prevent unreasonable invasions of privacy. There are no constitutional grounds present here to justify the suppression of evidence. “Exclusion of reliable evidence obtained in an otherwise legal and good faith seizure would not serve the administration of justice or the purpose of the legislative *305 directive of territorial responsibility.” Bickham, 404 So.2d at 933. The exclusionary rule does not extend to “non-constitutional violations of statutes which are not designed to protect the privacy interests of citizens.” Durke, 2003-3174, p. 1; 885 So.2d at 514.
Accordingly, we find the trial court erred in granting the defendant’s motion to suppress.
CONCLUSION
The totality of the circumstances establishes that Officer Bell had reasonable suspicion to investigate information personally presented to him by concerned citizens who witnessed criminal conduct. Officer Bell’s reasonable suspicions were corroborated within minutes when, just outside his territorial jurisdiction, he personally observed the defendant’s erratic driving. Under these circumstances, Officer Bell can be considered to have been in close pursuit under La.C.Cr.P. art. 213, and the subsequent detention of the defendant’s vehicle was authorized. Thus, Officer Bell’s actions were constitutionally reasonable under the Fourth Amendment and our state’s constitution. Even if Officer Bell acted outside of his jurisdiction in initiating the defendant’s detention, this violation of statutory law does not supply constitutional grounds for suppressing the evidence obtained after the defendant’s detention. We conclude the trial court erred in granting the defendant’s motion to suppress the evidence obtained after his detention andJjjSubsequent arrest.
DECREE
For the reasons stated herein, the judgments of the lower courts are vacated and defendant’s motion to suppress evidence is hereby denied. This matter is remanded to the trial court for further proceedings.
JUDGMENT OF THE LOWER COURTS VACATED; CASE REMANDED TO THE DISTRICT COURT.

. There was some discussion whether the truck was, in fact, a Chevy or a Dodge.

. This record does not contain a police report or any indication of what evidence has been suppressed, whether statements or physical evidence.

. We note the recent Navarette opinion similarly found indicia of reliability in an eyewitness account of events occurring contemporaneously. Id., 134 S.Ct. atp. 1688-89.

. La.C.Cr.P. art. 204 provides for the execution of warrants: "The warrant shall be directed to all peace officers in the state. It shall be executed only by a peace officer, and *298 may be executed in any parish by any peace officer having authority in die territorial jurisdiction where the person arrested is found, or by any peace officer having authority in one territorial jurisdiction in this state who enters another jurisdiction in close pursuit of the person arrested."
La.C.Cr.P. art. 213 describes when an arrest by an officer is lawful without a warrant, as follows: "A peace officer may, without a warrant, arrest a person when: (1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit; (2) The person to be arrested has committed a felony, although not in the presence of the officer; (3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer; or (4) The peace officer has received positive and reliable information that another peace officer from this state holds an arrest warrant, or a peace officer of another state or the United States holds an arrest warrant for a felony offense. A peace officer in close pursuit of a person to be arrested, who is making an arrest pursuant to this Article may enter another jurisdiction in this state and make the arrest."

. La.C.Cr.P. art. 3 states: "Where no procedure is specifically prescribed by this Code or by statute, the court may proceed in a manner consistent with the spirit of the provisions of this Code and other applicable statutory and constitutional provisions.”

. La.C.Cr.P. art. 214 states: "A private person may make an arrest when the person arrested has committed a felony, whether in or out of his presence.”

. We distinguish here those cases where we have emphasized the explicit legislative limitations on the arrest powers of the particular law enforcement agents under consideration. See State v. Longlois, 374 So.2d 1208 (La. 1979) (wildlife agent limited to arrests for violations of wildlife regulations and certain enumerated offenses, not including possession of marijuana) and State v. Patton, 374 So.2d 1211 (1979) (district attorney’s investigators are expressly denied arrest powers except insofar as they may arrest as private citizens). See Bickham, 404 So.2d at 933 n. 2.

. The Comments to Art. 213 state that the jurisprudence provides some very clear guides as to when the officer's belief is to be considered reasonable. One such example discussed is the fact situation here — "Information received from a stranger may be reasonable grounds for suspicion if the officer talks to the person and thus has a chance to judge his credibility.” La.C.Cr.P. art. 213, Official Revision Comment — -1966(c).

. For example, suppose the couple in the SUV had been a distraught mother who relayed the information that her child had just been abducted by a person driving a particular vehicle, headed in a certain direction and traveling a particular road. Under those circumstances, the officer could be expected to act with appropriate haste to investigate the mother’s claims. Likewise, we would not fault an officer who acted with alacrity if approached by an otherwise reliable-seeming *301 citizen who had information about the imminent explosion of a bomb in a public place.

. In his suppression hearing testimony, Mr. Gates testified he was traveling south on Highway 164 and would have continued south on that road to reach his home. He stated he only turned onto Boomtown Road because he thought he was being pulled over by police. In brief and oral argument to this court, the defense argues there is no evidence to show Mr. Gates was within the territorial limits of Haughton in response to a venue argument presented by the state. The defense points of there were several residences along the route and a person driving erratically could have turned off the roadway. Neither the trial judge nor the court of appeal discussed this point in particular. We note Mr. Gates did not specifically deny he had been traveling within the Haughton city limits, or on Highway 3227, in his testimony. Moreover, even if Officer Bell was mistaken that the truck driven by Mr. Gates was the same one referred to by the couple in the SUV, the information he had received coupled with his personal observations of erratic driving justified an investigatory stop of Mr. Gates’ truck.

. The defendant argued the facts here are closer to those in State v. Boyle, 34,686 (La. App. 2 Cir. 9/17/01); 793 So.2d 1281, where the officer was found to have acted solely on an anonymous tip. Yet even the majority in Boyle recognized “the holding in the present case would be different if, prior to approaching the defendant to question him, the officers had observed the defendant engaged in criminal activity or driving in an unusual manner.” Id., 34,686, p. 5; 793 So.2d at 1284. We have found Officer Bell personally observed the truck being driven down the center of the roadway and swerving into and out of the proper lane of travel before he initiated the detention of the defendant. Boothe, decided after Boyle, emphasized that Boyle was decided by a divided panel and should be relegated to its facts. Boothe, 37,703, p. 2; 844 So.2d at 1141.

. The defendant sought to explain why he turned off of Highway 164 onto Boomtown Road (in response to police emergency lights and a belief he was being pulled over by the police). The video recording shows the manner in which he conducted that maneuver. The video recording shows the defendant making swinging arcs with his vehicle.

. Under the facts of this case, we were not required to determine whether a person suspected of drunk driving should be granted “one free swerve” before they can legally be pulled over by police who have personally witnessed traffic violations. Id., 130 S.Ct. at 12. However, we find these comments of Chief Justice Roberts and Justice Scalia succinctly states the heartbreaking results that could occur with such a rule: "It will be difficult for an officer to explain to the family of a motorist killed by that swerve that the police had a tip that the driver of the other car was drunk but that they were powerless to pull him over, even for a quick check.” Id.